261 F.3d 245 (2nd Cir. 2001)
 UNITED HAULERS ASSOCIATION, INC., TRANSFER SYSTEMS INC., BLISS ENTERPRISES, INC., KEN WITTMAN SANITATION, BRISTOL TRASH REMOVAL, LEVITT'S COMMERCIAL CONTAINERS, INC. and INGERSOLL PICKUP INC., Plaintiffs-Appellees,
v.
ONEIDA-HERKIMER SOLID WASTE MANAGEMENT AUTHORITY, COUNTY OF ONEIDA and COUNTY OF HERKIMER, Defendants-Appellants.
 Docket Nos. 00-7593, 00-7595, 00-7597
August Term, 2000
 UNITED STATES COURT OF APPEALS, SECOND CIRCUIT
 Argued December 19, 2000
Decided July 27, 2001
 
 Appeal from an order of the United States District Court for the Northern District of New York, Pooler, Circuit Judge sitting by designation, granting summary judgment in favor of the plaintiffs-appellees with respect to defendants-appellants' liability under 42 U.S.C. §1983, enjoining the enforcement of certain local solid waste laws and declaring those laws unconstitutional under the Commerce Clause.
 Reversed and remanded.
 
 
 1
 Judge Calabresi concurs in a separate opinion.[Copyrighted Material Omitted]
 
 
 2
 MICHAEL J. CAHILL, Hauppauge, NY, for Appellant Oneida-Herkimer Solid Waste Mgmt. Authority.
 
 
 3
 RICHARD A. FRYE, Utica, NY (Foley Frye & Foley Law Firm, Utica, NY, of counsel), for Appellant County of Oneida.
 
 
 4
 Krishna K. Singh, Horigan, Horigan, Lombardo & Kelly, Amsterdam, NY, on the brief, for Appellant County of Herkimer.
 
 
 5
 KRISTIN CARTER ROWE, Albany, NY (Kevin M. Young, Young, Sommer, Ward, Ritzenberg, Wooley, Baker & Moore, Albany, NY, of counsel), for Appellees United Haulers Ass'n, Transfer Systems, Bliss Enterprises, Ken Wittman Sanitation, Bristol Trash Removal, Levitt's Commercial Containers and Ingersoll Pickup.
 
 
 6
 MICHAEL D. DIEDERICH, JR., Stony Point, NY, or Amicus Curiae N.Y.S. Ass'n for Solid Waste Management.
 
 
 7
 Before: MESKILL, LEVAL and CALABRESI, Circuit Judges.
 
 MESKILL, Circuit Judge:
 
 8
 Defendants-appellants Oneida-Herkimer Solid Waste Management Authority (Authority) and the Counties of Oneida and Herkimer (Counties) appeal a March 31, 2000 order of the United States District Court for the Northern District of New York, Pooler, Circuit Judge sitting by designation, granting summary judgment in favor of plaintiffs-appellees United Haulers Association, Inc., Transfer Systems, Inc., Bliss Enterprises, Inc., Ken Wittman Sanitation, Bristol Trash Removal, Levitt's Commercial Containers, Inc. and IngersollPickup, Inc. (collectively "United Haulers") with respect to defendants' liability under 42 U.S.C. §1983, enjoining the enforcement of the Counties' solid waste laws and declaring those laws unconstitutional under the Commerce Clause.
 
 
 9
 We must decide whether the Counties' so-called "flow control" ordinances, which require that all waste generated within the Counties be delivered to one of five publicly owned facilities, are unconstitutional under the Commerce Clause. The district court found the flow control laws "virtually indistinguishable from the laws examined and struck down" in C & A Carbone v. Town of Clarkstown, 511 U.S. 383 (1994) (Carbone), and SSC Corp. v. Town of Smithtown, 66 F.3d 502 (2d Cir. 1995), and, therefore, held that the ordinances were unconstitutional.
 
 
 10
 We hold that because the favored facilities are publicly owned, the ordinances do not discriminate against interstate commerce, and therefore are not subject to the rigorous test set forth in Maine v. Taylor, 477 U.S. 131, 138 (1986). We remand to the district court to consider whether the ordinances impose burdens on interstate commerce that are clearly excessive in relation to the local benefits. See Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).
 
 BACKGROUND
 
 11
 The history of local solid waste regulation in the state of New York and across the country has been well documented. See, e.g., Inc. Vill. of Rockville Ctr. v. Town of Hempstead, 196 F.3d 395, 396-98 (2d Cir. 1999); Harvey & Harvey, Inc. v. County of Chester, 68 F.3d 788, 791-92 (3d Cir. 1995). Thus, we only briefly discuss the events that prompted the Counties to implement their waste management scheme.
 
 
 12
 Historically, each city, town or village within the Counties was responsible for its own waste management. This balkanization led to the proliferation of waste dumps of all sizes, and with varying degrees of environmental accountability. The environmental risks and liabilities became apparent in the 1980s when over 600 local businesses and several local municipalities and school districts were named as third-party defendants in a federal environmental clean-up action against the Ludlow Landfill in Oneida County. See generally Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.
 
 
 13
 This "solid waste crisis," as Oneida County describes it, and the increased environmental risks and exposure to federal and state liability which flowed from it, prompted the Counties to seek a solution. Like many of their municipal neighbors in New York and throughout the country, the Counties devised a comprehensive waste management system in an attempt to provide for the safe and cost effective disposal of their residents' solid waste. Like many of their municipal neighbors, the Counties' plan is now the subject of a constitutional challenge.
 
 
 14
 A. The Counties' Solid Waste Management Solution
 
 
 15
 Oneida and Herkimer Counties are located in central New York, in the Mohawk Valley, and together encompass over 2,600 square miles with a combined population of approximately 306,000 persons, residing in 78 different cities, towns and villages. Both Counties are municipal corporations of the state of New York, and together constitute a single "planning unit" under the New York State Solid Waste Management Plan and its authorizing legislation. See N.Y. Envtl. Conserv. L. § 27-0107 (1) (a).
 
 
 16
 In late 1987, the Counties entered into a municipal contract for the purpose of coordinating and consolidating the management of their solid waste. To that end, they hired a consulting firm to prepare an environmental statement and solid waste management plan. The statement and plan contemplate the construction of six facilities collectively to manage the Counties' solid waste: a recycling center, a compost facility, a transfer station, a waste-to-energy plant, an ash landfill and a C & D (construction and demolition) debris landfill. The estimated cost of these facilities was $155-200 million.
 
 
 17
 The Counties requested that then-Governor Cuomo and the New York State Legislative Commission on Solid Waste Management (Commission) create a waste management authority to assume the Counties' joint waste management responsibilities. The Governor and Commission complied by creating the Authority, a public benefit corporation authorized by the Oneida-Herkimer solid waste management authority act of 1988 (Act). See generally N.Y. Pub. Auth. L. § 2049-aa. The Authority has the power, among other things, to collect, process and dispose of solid waste generated in the Counties. Moreover, the Act permits the Counties to contract with the Authority to obligate the Counties to ensure the continued operation and solvency of the Authority. See id. at §§2049-ee and tt. As amended in 1990, the Act prohibits the Authority from accepting solid waste (other than recyclable material) from outside of the Counties. See id. at §§ 2049-ee(4) and (7).
 
 
 18
 1. Agreements Between the Counties and the Authority
 
 
 19
 On May 10, 1989, the Authority and the Counties entered into a Solid Waste Management Agreement, in which the Authority agreed to manage and dispose of all solid waste within the Counties. In particular, the Authority agreed to take control of the operation of the Oneida County Energy Recovery Facility and the Oneida-Herkimer Recycling Center (Recycling Center) beginning on January 1, 1990, and to collect "tipping fees" sufficient to pay its operating and maintenance costs. See SSC Corp., 66 F.3d at 505 n.5 (describing "tipping fee" as an industry term for a disposal charge or gate fee). The Authority assumed the Counties' regulatory powers with regard to private haulers operating within the Counties. For their part, the Counties agreed to direct all recyclables to the Recycling Center and agreed to direct all solid waste generated in the Counties to facilities designated by the Authority.
 
 
 20
 On December 28, 1989, the Authority and the Counties entered into a second solid waste management agreement. In that agreement, the Authority reaffirmed its obligations under the first agreement and the Counties agreed to pay the Authority's operating costs and debt service to the extent those costs were not recouped through tipping fees and other disposal related charges.
 
 2. The Local Laws
 
 21
 In December 1989, the Oneida County Board of Legislators enacted Local Law No. 1 of 1990, Oneida's flow control law. The law requires that all solid waste generated within the County be picked up by the municipality, a licensed private hauler or the generator, and delivered to certain approved processing sites designated by the Authority.[1] Accordingly, private haulersmust obtain a permit from the Authority to pick up solid waste in the Counties. Failure to deliver that waste to the designated facilities subjects the private hauler to revocation of its permit, fines and imprisonment.
 
 
 22
 Two months later, in February 1990, the Herkimer County Legislature enacted Herkimer County Local Law No. 1 of 1990, Herkimer's flow control law, which is substantially similar to the Oneida flow control law.[2]
 
 3. Authority Activities
 
 23
 Between 1990 and 1992 the Authority issued over $51 million in bonds to finance the designated facilities, to construct the Green Waste Compost Facility and the Utica Transfer Station, and to refinance prior bonds. The Authority owns all five designated facilities and operates all but the Utica Transfer Station.
 
 
 24
 a. Utica Transfer Station Operating Agreement
 
 
 25
 In 1991, the Authority accepted bids for the operation of the Utica Transfer Station. The bidding process was open to all private waste disposal companies, in-state and out-of-state. The Authority received four bids, all from out-of-state businesses, which proposed delivery of the solid waste at the transfer station to eight landfills, seven of which were located outside of New York.
 
 
 26
 In June 1991, the Authority entered into a contract with Empire Sanitary Landfill, Inc. (Empire) to operate the Utica Transfer Station. Pursuant to that contract, Empire transported all solid waste processed at the transfer station to Empire's landfill in Taylor, Pennsylvania for disposal. The Authority agreed to deliver or cause to be delivered all solid waste generated or originating in the Counties (other than recyclables and waste burned at the Energy Recovery Facility) to the transfer station. The parties extended the contract to span the period 1995 to 1998.
 
 
 27
 In 1998, the Authority again accepted bids from private waste disposal companies. This time, Waste Management of New York (Waste Management), a Delaware limited liability company, prevailed. Waste Management agreed to dispose of the waste processed at the transfer station at two facilities, one located in-state and the other located in Erie, Pennsylvania. Waste Management continues to operate the transfer station on behalf of the Counties.
 
 
 28
 In the May 20, 1991 Final Local Solid Waste Management System Plan for the Counties, the Authority contemplates the development of additional facilities "to provide for all components of the waste stream for all residents of the two counties" (emphasis added). The Authority expressly states in the Plan that it "is wholly committed to the development of facilities within Oneida and Herkimer Counties toprovide for the region's long-term needs." In other words, the current out-sourcing of the transfer station's operation is a temporary measure until the Authority brings into operation a County landfill, the last of the six facilities contemplated in the original environmental plan, and is otherwise able to meet all of the Counties' solid waste management needs.
 
 
 29
 b. The Authority's Rules and Regulations
 
 
 30
 Pursuant to the May and December 1989 agreements and the local flow control laws enacted by the Counties, the Authority has promulgated rules and regulations. The Authority's 1995 Rules and Regulations provide that private haulers "must deliver all acceptable solid waste and curbside collected recyclables generated within Oneida and Herkimer Counties to an Authority designated facility." The 1995 Rules and Regulations also require all private haulers to obtain a Solid Waste Collection and Disposal Permit from the Authority. The Authority sets the applicable tipping fees, designates access route patterns to four of the five designated facilities and retains the right to redirect "solid waste... to the appropriate facility according to waste production, waste origin, waste type, seasonal fluctuations or planned operating procedures." To enforce the Counties' local laws and the 1995 Regulations, the Authority employs "garbage cops" (as coined by United Haulers) to monitor private haulers' activities and ensure compliance with the flow control ordinances.
 
 B. Alleged Effect on Private Haulers
 
 31
 The individual plaintiff haulers are four New York corporations and two New York sole proprietorships, each of which engaged in the collection, transport, processing and disposal of solid waste within the Counties. United Haulers Association, Inc. (Association) is a not-for-profit New York corporation comprised of solid waste management companies doing business within the Counties. Each of the individual plaintiffs is a member of the Association.
 
 
 32
 Under the 1995 Rules and Regulations, private haulers must pay the Authority a tipping fee of at least $86 per ton of solid waste disposed of at the Authority's facilities. If witnessed disposal is required or if the load contains more than 25% recyclables, the charge is increased to as much as $172 per ton. Even the lowest tipping fee charged under the Counties' scheme is higher than the market value for the disposal services the Authority provides. But for the Counties' flow control laws, United Haulers claims that it could deliver and dispose of solid waste at other facilities within the state of New York or in other states at a lower price. United Haulers submitted affidavits from Jeff Bliss, President of Bliss Enterprises, Inc. and David N. Levitt, Vice President of Levitt's Commercial Containers, Inc., averring that out-of-state disposal facilities accessible to the haulers charged significantly lower tipping fees. For example, United Haulers claims that Greentree Landfill in Pennsylvania is capable of accepting municipal waste from the haulers at a tipping fee of $26-30 per ton. Therefore, according to United Haulers, the Counties' flow control laws bar them from accessing a viable, and significantly cheaper, interstate market for waste disposal.
 
 C. District Court Proceedings
 
 33
 On April 14, 1995, United Haulers commenced the present action against the Counties and the Authority alleging that the flow control laws are unconstitutional and constitute a deprivation of United Haulers' constitutional rights. See 42 U.S.C. §1983.
 
 
 34
 Soon thereafter, United Haulers moved for summary judgment, seeking an order (1) declaring that the flow control laws unconstitutionally discriminate and/or unduly burden interstate commerce in violation of the Commerce Clause, (2) enjoining the Authority and the Counties from enforcing the flow control laws, (3) declaring that the Counties and the Authority deprived United Haulers of rights, privileges or immunities secured by the Constitution, and (4) holding the Counties and the Authority liable for damages and attorney's fees under 42 U.S.C. §1988.
 
 
 35
 United Haulers argued, as it does now, that "the recent and controlling decision by the United States Supreme Court in C& A Carbone, Inc. v. Town of Clarkstown establishes the unconstitutionality of the Flow Control Laws." United Haulers asserted that, like the laws stricken in Carbone, the Counties' flow control laws discriminate against interstate commerce to finance the Counties' solid waste management scheme. United Haulers pointed out that the flow control laws in this case are designed to support a much larger waste management system (almost 50 times more expensive) than that in Carbone and impact approximately three times more solid waste than in Carbone.
 
 
 36
 In opposition, the Counties and the Authority argued that they had adopted "an integrated system of solid waste disposal" to alleviate "important public health and environmental concerns" caused by the hodge-podge system of private enterprise and sub-standard disposal sites. They argued that the waste management system did not discriminate against or unduly burden interstate commerce under Carbone. Alternatively, they argued that they were entitled to further discovery pursuant to Fed. R. Civ. P. 56(e) and (f) to enable them to show that there were no alternative means to accomplish their legitimate goals. In their view, anything less than full discovery would "reward[] plaintiffs for their guerilla litigation strategy and punish[] the [defendants] in contravention of the intent and spirit of the Federal Rules of Civil Procedure."
 
 
 37
 Shortly after United Haulers moved for summary judgment, the Counties and the Authority answered the Complaint and served an initial set of interrogatories. At a June 1, 1995 scheduling conference, however, United Haulers requested a protective order staying discovery pending resolution of its motion. The magistrate judge granted the protective order suspending discovery. Accordingly, no discovery took place prior to the district court's determination of United Haulers' summary judgment motion that is the subject of this appeal.
 
 
 38
 The district court heard oral argument on United Hauler's motion for summary judgment in October 1995. Almost five years later, on March 31, 2000, the district court entered an order granting United Haulers' motion. The district court declared the flow control laws unconstitutional and enjoined the Counties and the Authority from enforcing them. After concluding that the Association did not have standing to assert a section 1983 damages claim, the district court granted summary judgment in favor of the individual haulers on that claim and referred the action to a magistrate judge for calculation of damages.
 
 
 39
 The Counties and the Authority filed timely notices of appeal on April 28, 2000. We heard argument on December 19, 2000, and following argument solicited supplemental briefing from the parties on several issues. We now reverse and remand.
 
 DISCUSSION
 
 40
 In 1996, we remarked that the federal docket was "clogged with -- of all things -- garbage."SSC Corp., 66 F.3d at 505. It remains so today. See, e.g., Maharg, Inc. v. Van Wert Solid Waste Mgmt. Dist., 249 F.3d 544 (6th Cir. 2001); On the Green Apartments L.L.C. v. City of Tacoma, 241 F.3d 1235 (9th Cir. 2001); see generally Stanley E. Cox, Garbage In, Garbage Out: Court Confusion about the Dormant Commerce Clause, 50 Okla. L. Rev. 155, 156 (1997) (noting that garbage cases lie "on the cutting edge of dormant Commerce Clause theory").
 
 
 41
 Although the Supreme Court's and this Court's recent spotlight on local, solid waste regulation provides us with a framework within which to analyze this challenge, many questions remain unanswered with respect to the constitutionality of municipal flow control laws. See generally Colin A. Fieman, The Second Circuit Upholds Waste Management Systems in the Wake of Carbone v. Clarkstown: The Decisions in USA Recycling, Inc. v. Town of Babylon and SSC Corp. v. Smithtown, 23 Fordham Urb. L.J. 767, 769 (1996) ("[A]lthough the Second Circuit has made considerable progress in clarifying the law in this area, it has left questions about the constitutionality of flow control unanswered."). Unfortunately, these missing pieces to the constitutional puzzle often force states and municipalities to engage in guesswork about the constitutionality of proposed solid waste management schemes, which are expensive and time-consuming to implement. See generally, e.g., Jennifer M. Anglim, Note, The Need for a Rational State and Local Response to Carbone: Alternate Means to Responsible, Affordable Municipal Solid Waste Management, 18 Va. Envtl. L.J. 129, 130-32 (1999) ("[T]he federal municipal solid waste... management jurisprudence has followed intertwined and often-conflicting legal theories and precedents, making it difficult for states and municipalities to plan."). With frequent reference to the guiding principles underlying the Supreme Court's dormant Commerce Clause jurisprudence, we attempt to fill in one more piece of this puzzle.
 
 A. Legal Background
 
 42
 The Commerce Clause states that "Congress shall have Power... [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, §8, cl. 3. On its face, the clause does not speak to the power, if any, of the states to regulate interstate commerce. Although the Supremacy Clause prohibits state regulation of interstate commerce in areas where Congress has spoken, see U.S. Const. art. VI, cl. 2, neither the text of the Commerce Clause nor the Supremacy Clause "say what the states may or may not do in the absence of congressional action." Dep't of Revenue v. Ass'n of Wash. Stevedoring Cos., 435 U.S. 734, 749 (1978) ("The Commerce Clause does not state a prohibition; it merely grants specific power to Congress. The prohibitive effect of the Clause on state legislation results from the Supremacy Clause and the decisions of this Court."). That question did not remain open for long.
 
 
 43
 In Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1 (1824), Justice Johnson sowed the seeds for the "dormant" or "negative" Commerce Clause by arguing that the power to regulate interstate commerce could not rest with two sovereigns. See id. at 227 (Johnson, J., concurring) (arguing that "since the power to prescribe the limits to... freedom [of commerce], necessarily implies the power to determine what shall remain unrestrained, it follows, that the power must be exclusive"); see also id. at 209 (Daniel Webster, as counsel, arguing that the Commerce Clause's affirmative grant to Congress "necessarily"prohibits local action that alters "what the regulating power designs to leave untouched"). In the years that followed, the Supreme Court consistently held that the Commerce Clause's affirmative grant of power to the federal government requires some concomitant limitation on the power of the several states. See Boris I. Bittker, Regulation of Interstate and Foreign Commerce § 6.01[A] (1999 & Supp. 2001); see also SSC Corp., 66 F.3d at 509 (noting that "federal courts have for more than 150 years invoked the Commerce Clause to scrutinize state regulations affecting interstate commerce").
 
 
 44
 Justice Jackson later expressed the rationale underlying the judicially created dormant Commerce Clause:
 
 
 45
 Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them.
 
 
 46
 H.P. Hood & Sons v. Du Mond, 336 U.S. 525, 539 (1949); see Carbone, 511 U.S. at 390 ("The central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent."). Justice Jackson's "national market" has led to "material success... the most impressive in the history of commerce," H.P. Hood & Sons, 336 U.S. at 538, arguably because the Supreme Court "consistently has rebuffed attempts of states to advance their own commercial interests by curtailing the movement of articles of commerce, either into or out of the state." Id. at 535. But see Edmund W. Kitch, Regulation, the American Common Market and Public Choice, 6 Harv. J.L. & Pub. Pol'y 119, 123-24 (1982) (challenging the practical efficiency resulting from the Court's dormant Commerce Clause jurisprudence).
 
 
 47
 Not surprisingly, the Court's effort to preserve a national market has, on numerous occasions, come into conflict with the states' traditional power to "legislat[e] on all subjects relating to the health, life, and safety of their citizens." Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 443 (1960). On these occasions, the Supreme Court has "struggled (to put it nicely) to develop a set of rules by which we may preserve a national market without needlessly intruding upon the States' police powers, each exercise of which no doubt has some effect on the commerce of the Nation." Camps Newfound/Owatonna v. Town of Harrison, 520 U.S. 564, 596 (1997) (Scalia, J., dissenting) (citing Okla. Tax Comm'n v. Jefferson Lines, 514 U.S. 175, 180-83 (1995)); see generally Boris I. Bittker, Regulation of Interstate and Foreign Commerce §6.01[A], at 6-5 ("[T]he boundaries of the [State's] off-limits area are, and always have been, enveloped in a haze."). Those rules are "simply stated, if not simply applied." Camps Newfound/Owatonna, 520 U.S. at 596 (Scalia, J., dissenting).
 
 B. Dormant Commerce Clause Analysis
 
 48
 As a threshold matter, a court must determine whether a state or local government is "regulating" and, if so, whether that regulation affects interstate commerce. See Carbone, 511 U.S. at 389; On the Green Apartments L.L.C., 241 F.3d at 1241-42.
 
 
 49
 The dormant Commerce Clause restricts certain state regulation of interstate commerce. It does not prohibit a state from participating in the free market if it acts like a private enterprise. See, e.g., Reeves, Inc. v. Stake, 447 U.S. 429, 437 (1980) ("There is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market."); Sal Tinnerello & Sons v. Town of Stonington, 141 F.3d 46, 55 (2d Cir. 1998). In general, a state regulates when it exercises governmental powers that are unavailable to private parties. See SSC Corp., 66 F.3d at 512. Classic hallmarks of government regulation include the threatened imposition of fines and/or jail terms to compel behavior. See id. The Counties' flow control laws require private haulers to obtain a permit from the Counties and to deliver all waste to Authority designated facilities. Failure to do either exposes the private hauler to fines, revocation of its permit to pick up solid waste, and imprisonment. Therefore, the Counties have "avail[ed themselves] of the unique powers or special leverage [they] enjoy[] by virtue of [their] status as sovereign[s]," Inc. Vill. of Rockville Ctr., 196 F.3d at 399, and, thus, are regulating the market for waste collection and disposal.
 
 
 50
 The Supreme Court has left no doubt that flow control regulation affects interstate commerce. In Carbone, the Supreme Court stated that "[w]hile the immediate effect of the ordinance is to direct local transport of solid waste to a designated site within the local jurisdiction, its economic effects are interstate in reach." 511 U.S. at 389. Although the Clarkstown ordinance differs from the Counties' laws in that it applied to solid waste originating outside of Clarkstown, the Court also noted that "even as to waste originant in Clarkstown, the ordinance prevents everyone except the favored local operator from performing the initial processing step." Id.; see On the Green Apartments L.L.C., 241 F.3d at 1241 ("While Tacoma's ordinance does not require that the local transportation of out-of-state waste be deposited at a site in the city, it does prevent waste from within the city from being deposited outside of the city."). As such, the Counties' flow control laws sufficiently affect interstate commerce to trigger a deeper dormant Commerce Clause review. As in Carbone, "[t]he real question is whether the flow control ordinance[s] [are] valid despite [their] undoubted effect on interstate commerce." 511 U.S. at 389.
 
 1. Discrimination or Incidental Effects
 
 51
 Once a court determines that a state regulation affects interstate commerce, it must next determine whether the regulation "discriminates against interstate commerce" or regulates even-handedly with incidental effects on interstate commerce. Id. at 390 (internal quotation marks and citations omitted); see also Gary D. Peake Excavating v. Town Bd. of Hancock, 93 F.3d 68, 73 (2d Cir. 1996) ("The Supreme Court has established a two-step approach to determine whether a state or municipal law violates the dormant Commerce Clause.").
 
 
 52
 A local law is discriminatory if it provides for "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." USA Recycling v. Town of Babylon, 66 F.3d 1272, 1281 (2d Cir. 1995) (quotation marks omitted); see also Sal Tinnerello & Sons, 141 F.3d at 55. Where a plaintiff shows that a regulation is discriminatory, the burden shifts to the state or local government to demonstrate that the local benefits outweigh the discriminatoryeffects and that no nondiscriminatory alternative exists to effectuate the local goals. USA Recycling, 66 F.3d at 1281-82. A discriminatory state or local regulation is virtually per se unconstitutional because of "the virtual certainty that such laws, at least in their discriminatory aspect, serve no legitimate, non-protectionist purpose." Carbone, 511 U.S. at 422 (Souter, J., dissenting); see Gary D. Peake Excavating, 93 F.3d at 74. In the rare case where a court finds the local interest compelling and the alternatives non-existent, it must uphold the challenged regulation. See, e.g., Taylor, 477 U.S. at 151 ("Maine's ban on the importation of live baitfish serves legitimate purposes that could not adequately be served by available nondiscriminatory alternatives.").
 
 
 53
 On the other hand, "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Pike, 397 U.S. at 142; Or. Waste Sys. v. Dep't of Envtl. Quality, 511 U.S. 93, 99 (1994). Because this burden is far less demanding than the burden under Maine v. Taylor, the critical inquiry is often "whether [the local law] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns." City of Philadelphia v. New Jersey, 437 U.S. 617, 624 (1978).
 
 
 54
 The district court held that the Counties' flow control laws discriminated against interstate commerce in favor of the Authority's designated facilities and that, in light of Carbone, the Counties could not, as a matter of law, demonstrate that no alternatives existed. The district court relied on its belief that "[c]ourts have considered it almost a foregone conclusion that flow control laws violate the dormant commerce clause." (citing Sal Tinnerello & Sons, 141 F.3d at 56; Inc. Vill. of Rockville Ctr., 196 F.3d at 397). Accordingly, the district court did not reach the second line of inquiry, i.e. whether "the burden imposed [by the regulations] on [interstate] commerce [was] clearly excessive in relation to the putative local benefits." Pike, 397 U.S. at 142. We review the district court's determination on summary judgment de novo, applying the same legal standard as that used by the district court. See Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001). We disagree with the district court on several grounds.
 
 
 55
 First, the district court erroneously attributed to the Supreme Court a per se prohibition against flow control laws. See Harvey & Harvey, 68 F.3d at 798 ("That [an] ordinance requires the use of [a] selected facility, thus prohibiting the use of non-designated facilities (which may be out of state), does not itself establish a Commerce Clause violation."); Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 188 (1st Cir. 1999) ("We do not interpret Clarkstown as explicating a broad-based ban on every flow-control ordinance that happens to be coupled with an exclusive contractual arrangement in favor of an in-state operator."). Unfortunately, the district court's misconception led it to deny the Counties' discovery and essentially grant summary judgment without reference to the unique facts of this case.[3] TheCounties' flow control laws, like any other challenged ordinance, must be analyzed under the principles articulated in Carbone according to their unique facts. Second, and more importantly, the district court erred in its Commerce Clause analysis by failing to recognize the distinction between private and public ownership of the favored facility.
 
 
 56
 The following discussion focuses on the latter of these errors and concludes that a municipal flow control law does not discriminate against out-of-state interests in violation of the Commerce Clause when it directs all waste to publicly owned facilities. As such, the district court should have analyzed the Counties' flow control laws under the Pike test to determine whether the laws' effects on interstate commerce substantially outweigh the local benefits.
 
 2. Private Ownership vs. Public Ownership
 
 57
 The Counties' waste management scheme creates a bottleneck. Within the bottle, private waste haulers compete for the opportunity to collect solid waste from individual and corporate generators located within the Counties. Once collected, the private waste haulers must deliver the waste to one of five designated, Authority-owned processing facilities located within the Counties, the "bottleneck." For the time being, once the waste has been delivered, private waste disposal companies, both in-state and out-of-state, stand outside the bottle to bid, on an open and competitive basis, for the right to process and ultimately dispose of the waste delivered to the Counties' transfer station. The parties do not dispute, in any relevant respect, how the Counties' system is organized, but instead disagree about whether the flow control restrictions on private haulers, those within the bottle, are discriminatory under the Commerce Clause.
 
 
 58
 The Counties and the Authority urge us to analyze the flow control ordinances as part of their overall waste management scheme. Specifically, they argue that the bidding process for the operation of the Utica Transfer Station negates any alleged hoarding of the disposal service because it opens the local disposal market to out-of-state bidders. See, e.g., Harvey & Harvey, 68 F.3d at 801-02 (holding that selecting a favored facility or business with an open and fair bidding process that permits out-of-state competition comports with the dormant Commerce Clause). The district court, however, did not reach this aspect of the Counties' system. Furthermore, in several post-Carbone decisions, we severed our analysis of flow control ordinances from other aspects of a municipal waste management plan. See, e.g., Inc. Vill. of Rockville Ctr., 196 F.3d at 398-99; SSC Corp., 66 F.3d at 512-13; see also Huish Detergents v. Warren County, 214 F.3d 707, 715 (6th Cir. 2000). We do so here as well.
 
 
 59
 a. Carbone
 
 
 60
 Our analysis naturally begins with Carbone, the Supreme Court's only occasion thus far to apply the Commerce Clause to a flow control ordinance. The SupremeCourt was presented with the following setting.
 
 
 61
 The Town of Clarkstown, New York agreed with environmental authorities to close its landfill and build a solid waste transfer station. See Carbone, 511 U.S. at 387. "A local private contractor agreed to construct the facility," which the local contractor would own and operate for a period of five years. Id. The town thereafter agreed to buy the station back for one dollar. Id. To make the endeavor worthwhile, the contractor charged a set tipping fee for each ton of solid waste disposed of at the transfer station. The town guaranteed the transfer station a minimum yearly waste flow, which was intended to generate tipping fees sufficient to finance the cost of the facility. See id. at 412. To meet the minimum tonnage guarantee, the town enacted a flow control ordinance that required all waste within the town to be delivered to the transfer station. Id. The purpose of the ordinance was to "finance [the] new facility with the income generated by the tipping fees." Id.
 
 
 62
 Clarkstown's ordinance differs from the Counties' ordinances in two significant respects. First, the Clarkstown ordinance applied to all solid waste within the town, whether that waste was generated within or outside the town. In contrast, the Counties' flow control ordinances apply only to waste generated within the Counties.[4] We do not rely on that distinction because, in SSC Corp., we struck down a flow control ordinance as "indistinguishable" from the ordinance in Carbone, even though the challenged law, unlike Carbone, applied only to waste originating within the town. 66 F.3d at 514. Second, the Clarkstown ordinance differs from the Counties' ordinances because the transfer station in Clarkstown was owned by a "local private contractor." Carbone, 511 U.S. at 387. The Counties' transfer station, as well as the other designated facilities, are publicly owned. This latter distinction is determinative.
 
 
 63
 The majority opinion in Carbone held that Clarkstown's flow control ordinance was "just one more instance of local processing requirements that [the Court] long [has] held invalid." Id. at 391. Stated otherwise, the ordinance "hoard[ed] solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility," in that case "a single local proprietor." Id. at 392. The Court repeatedly referenced the private nature of the favored facility and repeatedly alluded to the dangers of allowing local government to favor local industry or a single local business over out-of-state competition. For example, the Court held that "the town may not employ discriminatory regulation to give [the designated facility] an advantage over rival businesses from out of State." Id. at 394 (emphasis added). And again, "[s]tate and local governments may not use their regulatory power tofavor local enterprise by prohibiting patronage of out-of-state competitors or their facilities." Id. (emphasis added).
 
 
 64
 United Haulers casts a blind eye to the Court's repeated reference to Clarkstown's favoritism for a single local proprietor. United Haulers contends that, read in conjunction, all three Carbone opinions imply a rejection of the distinction between public and private ownership for Commerce Clause purposes. The argument proceeds as follows: The dissenters in Carbone argued that the favored facility was an agent of the municipality and therefore publicly owned. Accordingly, the dissent argued that the ordinance did not discriminate against out-of-state business in favor of in-state business:
 
 
 65
 While our previous local processing cases have barred discrimination in markets served by private companies, Clarkstown's transfer station is essentially a municipal facility, built and operated under a contract with the municipality and soon to revert entirely to municipal ownership....
 
 
 66
 The majority ignores this distinction between public and private enterprise, equating Local Law 9's "hoard[ing]" of solid waste for the municipal transfer station with the design and effect of ordinances that restrict access to local markets for the benefit of local private firms.
 
 
 67
 See id. at 419-20 (Souter, J., dissenting) (footnote omitted). The majority, the argument continues, although clearly aware of the dissent's contention, nonetheless held that the town may not use discriminatory regulation to earn revenues for its project. This holding, according to United Haulers, necessarily rejected the distinction between public and private ownership relied on by the dissent.
 
 
 68
 We disagree with United Haulers' reading of Carbone. A careful reading of the separate opinions in Carbone does not support United Haulers' theory. Indeed, if we were to divine direct guidance from those opinions, we would reach the opposite conclusion; namely, that in Carbone the Justices were divided over the fact of whether the favored facility was public or private, rather than on the import of that distinction.
 
 
 69
 As noted above, the Carbone majority referenced the private character of the favored facility several times, id. at 387 ("local private contractor"); id. at 392 ("single local proprietor"); id. at 394 ("to give that project an advantage over rival businesses from out of State" (emphasis added)). In contrast, Justice O'Connor, in her concurrence, characterized the Clarkstown scheme as a public monopoly, foreclosing competition from all competitors in-state and out-of-state. See id. at 402-03. As such, Justice O'Connor rejected the notion that the Clarkstown ordinance should be found discriminatory and, thus, analyzed under the Maine v. Taylor framework. Instead, Justice O'Connor would have analyzed, and ultimately struck down, the ordinance under the Pike balancing test. Id. at 403-07. Like Justice O'Connor, the three-justice dissent clearly articulated its view that the Clarkstown transfer station was public for dormant Commerce Clause purposes and, therefore, would have analyzed the ordinance under the Pike test. See id. at 410-30. Unlike Justice O'Connor, however, the dissent would have upheld the ordinance. In the face of these opinions, the majority's frequent reference to the private local contractor that legally owned the transfer station and its silence regarding the distinction between public and private ownership leads us to conclude that underlying its analysis of the constitutionality ofthe ordinance was a finding that the favored facility was private rather than public.
 
 
 70
 Nevertheless, we require more than the Court's silence on this point before concluding that it either rejected or accepted the public/private distinction advocated by the concurring and dissenting opinions. See Fort Gratiot Sanitary Landfill v. Mich. Dep't of Natural Res., 504 U.S. 353, 358-59 (1992) (noting that the case did not "raise any question concerning policies that municipalities or other governmental agencies may pursue in the management of publicly owned facilities"). As the majority in Carbone did not directly address the issue and its language can fairly be described as elusive on that point, we proceed to examine those "local processing" cases, upon which the Court placed heavy reliance. This examination removes any remaining doubt we may have had regarding the importance of the distinction between private and public ownership in the dormant Commerce Clause analysis of such cases. As discussed in great detail by the Carbone dissent, in each and every one of the local processing cases the challenged laws favored a local private business, industry or investment (not a state-owned facility or a public monopoly) to the detriment of out-of-state competitors.
 
 
 71
 b. The Local Processing Cases
 
 
 72
 A commonly cited example of the Court's local processing cases is Dean Milk Co. v. City of Madison, 340 U.S. 349 (1951). There, the Court struck down a city of Madison, Wisconsin ordinance that required all milk sold in the city to be pasteurized within five miles of the central portion of the city. The ordinance applied to all businesses, in-state and out-of-state. The "practical effect" of the ordinance, however, was to "erect[] an economic barrier protecting a major local industry against competition from without the State." 340 U.S. at 354 (emphasis added). The fact that out-of-state businesses could build pasteurizing facilities within the five-mile radius did not make it any less discriminatory. Requiring local investment benefitted the city at the expense of other states and municipalities. In South-Central Timber Dev. v. Wunnicke, 467 U.S. 82 (1984), a four-justice plurality confirmed that export restraints undertaken to "promot[e] employment" or investment within the state fell "within the rule of virtual per se invalidity." Id. at 100-01. There, the Court struck down a state regulation requiring in-state processing of timber. See id.; see also Hughes v. Oklahoma, 441 U.S. 322, 338 (1979) (striking statute that restricted the number of minnows that could be transported out-of-state); Minnesota v. Barber, 136 U.S. 313, 323 (1890).
 
 
 73
 Other decisions in the local processing line of cases evidence the same intent to prevent state or local governments from favoring in-state business or investment at the expense of out-of-state businesses. In Baldwin v. G.A.F. Seelig, 294 U.S. 511 (1935), another milk case, the Court struck down an ordinance which erected barriers to out-of-state competition of the local milk industry by instituting a "system of minimum prices." Id. at 519. In Foster Fountain Packing Co. v. Haydel, 278 U.S. 1 (1928), the Court struck down a Louisiana statute which forbade the export of shrimp unless the heads and hulls had first been removed within the state. Id. at 12-14; see Johnson v. Haydel, 278 U.S. 16 (1928) (striking a similar Louisiana statute regarding thepre-shipment processing of oysters); see also Toomer v. Witsell, 334 U.S. 385, 403-07 (1948) (striking down South Carolina statute that required shrimp fishermen to unload, pack and stamp their catch before shipping it to another state). The Court held these statutes discriminatory because, whether in design or effect, they benefitted the local seafood processing industry over out-of-state competition.
 
 
 74
 United Haulers asks us to focus on the Court's broadly stated prohibition against the "hoarding" of local resources that otherwise would enter the stream of interstate commerce. A blanket prohibition against the hoarding of articles of commerce would appear to preclude the Counties' flow control scheme. However, we must interpret the Court's holdings in context, not in a vacuum. The common thread in the Court's dormant Commerce Clause jurisprudence, highlighted in the local processing cases discussed above, is that a local law discriminates against interstate commerce when it hoards local resources in a manner that favors local business, industry or investment over out-of-state competition. See, e.g., College Sav. Bank v. Fl. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 685 (1999) (describing the "evil" addressed by the Commerce Clause as "the prospect that States will use custom duties, exclusionary trade regulations, and other exercises of governmental power (as opposed to the expenditure of state resources) to favor their own citizens"). The majority in Carbone recognized this additional requirement while describing the evils of local processing laws: "Put another way, the offending local laws hoard a local resource -- be it meat, shrimp,... milk [or garbage] -- for the benefit of local businesses that treat it." 511 U.S. at 392 (emphasis added).
 
 
 75
 There is sound reason for the Court's consistent, although often unstated, recognition of the distinction between public and private ownership of favored facilities:
 
 
 76
 Reasons other than economic protectionism are... more likely to explain the design and effect of an ordinance that favors a public facility.... An ordinance that favors a municipal facility, in any event, is one that favors the public sector, and if we continue to recognize that the States occupy a special and specific position in our constitutional system and that the scope of Congress' authority under the Commerce Clause must reflect that position, then surely this Court's dormant Commerce Clause jurisprudence must itself see that favoring state-sponsored facilities differs from discriminating among private economic actors, and is much less likely to be protectionist.
 
 
 77
 Id. at 421 (Souter, J., dissenting) (internal quotation marks and citation omitted). Not only are such regulations "less likely to be protectionist," id., they are less likely to give rise to retaliation and jealousy from neighboring states. Moreover, ordinances that favor a public facility to the detriment of all private actors are equipped with a built-in check: municipal legislators are accountable to citizens, many of whose interests are likely to be aligned to some degree with the interests of private business, either as owners, employees or investors. Where the local legislation benefits local industry to the detriment of its competition, as in all of the local processing cases, this check is inadequate. Here it is not.
 
 
 78
 The principal burden of any economic inefficiency imposed by the Counties' ordinances falls on the residents of the Counties. They must pay over twice as much to dispose of their solid waste as they paid prior to the adoption of theordinances. There is no evidence that any out-of-state business or individual is paying more for waste collection or disposal as a result of the ordinances (as was the case in Carbone). The plaintiffs here are local waste collection companies. While it is true that private waste processors both in-state and out-of-state are prevented by the ordinances from competing to perform and receive payment for the operations performed at the mandatory transfer station, that disadvantage does not fall more heavily on out-of-state concerns than on local ones. The out-of-state processors furthermore have not complained, and there is no indication the deprivation represents a meaningful economic loss.
 
 
 79
 The Commerce Clause was not passed to save the citizens of Clarkstown from themselves. It should not be wielded to prevent them from attacking their local garbage problems with an ordinance that does not discriminate between local and out of town participants in the private market for trash disposal services and that is not protectionist in its purpose or effect.
 
 
 80
 Id. at 430 (Souter, J., dissenting). To the extent that a state or local government risks causing inconsistent local laws or inciting retaliation among the states to the detriment of the "national market," the Pike test is a suitable vehicle for meaningful judicial review. 397 U.S. at 142; see Healy v. The Beer Inst., 491 U.S. 324, 336-37 (1989) (holding that, under the Pike test, "the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States").
 
 
 81
 United Haulers also relies on the fact that no case has yet expressly relied on the distinction between public and private ownership, see U & I Sanitation v. City of Columbus, 205 F.3d 1063, 1067-68 (8th Cir. 2000); Huish Detergents, 214 F.3d at 715-16 (striking down regulation that awarded private local waste collection company franchise over County collection duties); Waste Mgmt. v. Metro. Gov't, 130 F.3d 731, 733-36 (6th Cir. 1997); Harvey & Harvey, 68 F.3d at 807-09 (remanding for consideration of effects of local action awarding exclusive waste disposal contract to private local business), and that a number of appellate and district courts have implicitly rejected the distinction without discussion. See Waste Sys. Corp. v. County of Martin, 985 F.2d 1381, 1385-89 (8th Cir. 1993) (striking down ordinance that required all waste generated within locality to be delivered to public waste facility); Coastal Carting Ltd. v. Broward County, 75 F.Supp.2d 1350, 1352 & n.1 (S.D. Fla. 1999); Randy's Sanitation v. Wright County, 65 F.Supp.2d 1017 (D. Minn. 1999); Zenith/Kremer Waste Sys. v. W. Lake Superior Sanitary Dist., 1996 WL 612465, at *1-3, 10 n.13 (D. Minn. July 2, 1996); Waste Recycling v. Southeast Ala. Solid Waste Disposal Auth., 814 F.Supp. 1566, 1570, 1577-83 (M.D. Ala. 1993) (striking down flow control ordinances which required all waste to be delivered to a Public Authority landfill), aff'd, 29 F.3d 641 (11th Cir. 1994) (unpublished table decision). Assuming that these courts were faced with pure public ownership of the favored facility, as we are here, their holdings are not binding on our determination and have little persuasive value given that the courts did not directly address the issue we decide today.
 
 
 82
 Only one case has expressly addressed and rejected the distinction. See Southcentral Pa. Waste Haulers Ass'n, 877 F.Supp. at 943. There, private waste haulers were required by law to deliver all solid waste to a landfill, owned and operatedby the local solid waste authority, a public corporation. Id. at 938. The defendants, like the Counties and the Authority here, argued that Carbone did not apply to an ordinance that favored a publicly owned facility. Id. at 943. The district court, relying primarily on the Supreme Court's statements about hoarding local resources, was "not persuaded that the public nature of the Authority facility changes the applicable analysis." Id. (citing Waste Sys. Corp., 985 F.2d at 1387, and Waste Recycling, 814 F.Supp. at 1578). We believe that it does change the analysis and we respectfully disagree with that decision for the reasons already discussed.
 
 
 83
 Moreover, we find ample precedential support for our conclusion in (1) the consistent underlying facts of the local processing line of cases, a line in which the majority squarely placed Carbone, and (2) the opinions of four Supreme Court Justices, all of whom characterized the facility in Carbone as publicly owned, and therefore would have analyzed the challenged ordinance under the more lenient Pike test. In this case, unlike Carbone, there is no confusion or room for debate regarding the ownership of the favored facilities. They are owned by the Authority, a public entity, and not by any local business.
 
 
 84
 To summarize, a flow control ordinance governing the processing of waste is not discriminatory under the Commerce Clause unless it favors local private business interests over out-of-state interests. Flow control regulations like the Oneida-Herkimer ordinances, which negatively impact all private businesses alike, regardless of whether in-state or out-of-state, in favor of a publicly owned facility, are not discriminatory under the dormant Commerce Clause. The district court erred by so holding.
 
 C. The Pike Balancing Test
 
 85
 Having concluded that the Counties' system does not discriminate against interstate commerce in favor of in-state business interests, we admit a temptation to undertake the Pike balancing test in the first instance.
 
 
 86
 This temptation, to which we do not succumb, arises from the well-settled principle that waste disposal is a traditional local government function. See Resource Conservation and Recovery Act, 42 U.S.C. §6901 (a) (4)); N.Y. Gen. Mun. L. §120-aa; Carbone, 511 U.S. at 419-20 (Souter, J., dissenting); Sporhase v. Nebraska ex rel. Douglas, 458 U.S. 941, 956 (1982) ("[P]rotecting the health of its citizens -- and not simply the health of its economy -- is at the core of its police power."); see also Cal. Reduction Co. v. Sanitary Reduction Works, 199 U.S. 306, 320-21 (1905); Gary D. Peake Excavating, 93 F.3d at 76 ("Legislation pertaining to public health and safety consistently has been recognized as an important local interest.").
 
 
 87
 In the past, we have held that a municipality "has legitimate -- indeed, compelling -- interests that are served by its waste management program." USA Recycling, 66 F.3d at 1288. In USA Recycling we went so far as to state that "[t]he local interests that are served by consolidating garbage service in the hands of the town -- safety, sanitation, reliable garbage service, cheaper service to residents -- would in any event outweigh any arguable burdens placed on interstate commerce." Id. at 1295; see Carbone, 511 U.S. at 430 (Souter, J., dissenting) (arguing that any burdens on interstate commerce were "readily justified by the ordinance's legitimate benefits in reliable and sanitary trash processing"). But see Carbone, 511 U.S. at 407-10 (O'Connor,J., concurring). We will follow our own advice, however, and resist the temptation to rule as a matter of law prior to adequate discovery and further argument by the parties, which will undoubtedly assist the district court in this fact-intensive determination.
 
 
 88
 We do hold, however, that although it does not, in and of itself, give a municipality free reign to place burdens on the free flow of commerce between the states, the fact that a municipality is acting within its traditional purview must factor into the district court's determination of whether the local interests are substantially outweighed by the burdens on interstate commerce. With that understanding, we reverse and remand for a determination of whether the Counties' flow control laws pass constitutional muster under the Pike balancing test.
 
 CONCLUSION
 
 89
 For the foregoing reasons, we reverse the district court's judgment and remand for further proceedings consistent with this opinion.
 
 
 90
 The parties shall bear their own costs.
 
 
 
 NOTES:
 
 
 [1]
 Section 2 (a) of the Oneida Local Law provides:
 In order to provide for public health and safety and to facilitate the conservation of vital resources: Each person shall provide for the removal of solid waste and recyclables from the property on which they are generated either through a service provided by a municipality or licensed private hauler or by direct haul by the individual generator to a disposal location approved by the County.
 (emphasis added).
 
 
 [2]
 Section 2 (c) of the Herkimer Local Law provides:
 After placement of garbage and of recyclable materials at the roadside or other designated area approved by the Legislature by a person for collection in accordance herewith, such garbage and recyclable material shall be delivered to the appropriate facility designated by the Legislature, or by the Authority pursuant to contract with the County.
 (emphasis added).
 
 
 [3]
 In doing so, the district court also effectively foreclosed the Counties' ability to show that they had no reasonable alternatives to implementing flow control laws. Although Maine v. Taylor is the only example of a state meeting the strict burden imposed on a discriminatory regulation, district courts should allow localities an opportunity to make that showing. See, e.g., Southcentral Pa. Waste Haulers Ass'n v. Bedford-Fulton-Huntingdon Solid Waste Auth., 877 F.Supp. 935, 944 (M.D. Pa. 1994) (denying plaintiffs' motion for summary judgment because the defendants' claim that there were no alternatives "raises a disputed issue of material fact"). Such an opportunity may require discovery into, and an examination of, the specific alternatives, if any, available to the locality, based on its unique geographical, practical and historical characteristics.
 
 
 [4]
 Carbone owned a recycling facility within the Town of Clarkstown, but a significant amount of its waste was collected in the state of New Jersey. The briefs and oral argument transcript reveal that Carbone challenged the ordinance only to the extent that its application to waste originating out-of-state increased the cost of disposal for New Jersey generators and subjected Carbone to inconsistent local regulations. See C & A Carbone v. Town of Clarkstown, 1993 WL 757637, at *18-19 (U.S. Dec. 7, 1993) (oral argument transcript); C & A Carbone v. Town of Clarkstown, 1993 WL 433038, at *23 (U.S. July 16, 1993) (petitioners' brief); see also Carbone, 511 U.S. at 407 (O'Connor, J., concurring) (striking the ordinance under the Pike test, in part because "operations like petitioners' cannot comply with the requirements of both [Clarkstown and the State of New Jersey])."
 
 
 CALABRESI, J., concurring:
 
 91
 I concur in both the result and the opinion. I do so because this case deals with waste processing by a publicly owned facility. Waste disposal is both typically and traditionally a local government function. With respect to such functions, the opinion's analysis of the significance of public ownership under C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383 (1994), seems to me quite right. Whether the same analysis would apply to activities that are not traditionally governmental is not before us. This case therefore does not answer the question of how such situations are to be examined in light of Carbone.