*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0035p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NATIONAL SOLID WASTES MANAGEMENT
ASSOCIATION,

　　　　　　　　　　　　*Plaintiff-Appellee,*

　　　　*v.*

DAVIESS COUNTY, KENTUCKY,

　　　　　　　　　　　　*Defendant-Appellant.*

No. 04-6498

---

Appeal from the United States District Court
for the Western District of Kentucky at Owensboro.
No. 04-00031—Joseph H. McKinley, Jr., District Judge.

Argued: November 29, 2005

Decided and Filed: January 24, 2006

Before: CLAY and COOK, Circuit Judges; COOK, District Judge.[*]

---

**COUNSEL**

---

**ARGUED:** Allen W. Holbrook, SULLIVAN, MOUNTJOY, STAINBACK & MILLER, Owensboro, Kentucky, for Appellant. Dennis J. Conniff, FROST BROWN TODD, Louisville, Kentucky, for Appellee. **ON BRIEF:** Allen W. Holbrook, SULLIVAN, MOUNTJOY, STAINBACK & MILLER, Owensboro, Kentucky, for Appellant. Dennis J. Conniff, Amy D. Cubbage, Sheryl G. Snyder, FROST BROWN TODD, Louisville, Kentucky, for Appellee. Michael J. Cahill, GERMANO & CAHILL, Holbrook, New York, for Amici Curiae.

---

**OPINION**

---

CLAY, Circuit Judge. Defendant Daviess County, Kentucky appeals the November 19, 2004 order of the United States District Court for the Western District of Kentucky granting summary judgment for Plaintiff National Solid Wastes Management Association ("NSWMA"), declaring proposed Daviess County Ordinance 830.5 ("Ordinance") unconstitutional, and enjoining the County from enforcing the terms of the Ordinance. For the reasons set forth below, this Court **AFFIRMS** the district court order.

---

[*]The Honorable Julian A. Cook, United States District Judge for the Eastern District of Michigan, sitting by designation.

## I.  BACKGROUND

### A.    PROCEDURAL HISTORY

On March 25, 2004, Plaintiff filed a complaint against Defendant that sought a declaratory judgment that the Ordinance was unconstitutional because it violated the dormant Commerce Clause and a permanent injunction barring Defendant from enforcing the Ordinance against Plaintiff's members.

Both parties filed motions for summary judgment.

On November 19, 2004, the district court granted Plaintiff's motion for summary judgment, denied Defendant's motion for summary judgment, issued a declaratory judgment that the Ordinance was unconstitutional, and issued a permanent injunction barring Defendant from enforcing the terms of the Ordinance.

On December 17, 2004, Defendant timely filed a notice of appeal.

### B.    FACTS

The facts are not in dispute.  Defendant is a county located in Kentucky.  Under Kentucky law, Defendant is responsible for developing and implementing solid waste management plans for the county.  Ky. Rev. Stat. Ann. § 109.011(9) (West 2005).  Pursuant to this responsibility, Defendant enacted the Ordinance on February 19, 2004.  The Ordinance states, in relevant part:

1.    Daviess County Fiscal Court shall provide universal municipal solid waste collection within its jurisdiction through the grant of nonexclusive franchises.

2.    All franchise agreements entered into under this ordinance shall require the party providing municipal solid waste collection service to dispose of the waste they collect at the Daviess County Landfill or Transfer Station.

3.    Nonexclusive franchises shall be granted to all haulers that are properly registered in accordance with KRS 224.43-315(2), have properly filed an annual report as required by KRS 224.43-315(3), and are in compliance with all other applicable laws and regulations.

4.    No hauler shall be allowed to collect municipal solid waste in Daviess County unless granted a franchise by Daviess County Fiscal Court.

Plaintiff is a trade association whose members are "engaged in various aspects of solid waste management, including the collection, transportation and disposal of municipal solid waste generated in Daviess County." (J.A. at 8.)  One of these members is Republic Services of Kentucky, LLC ("Republic").  Republic currently conducts business in Daviess County as a waste collector, and it disposes of this waste either at Plaintiff's transfer station or at a Kentucky landfill owned by Republic.  Plaintiff claims that its members operating within Daviess County as waste collectors may need to dispose of waste in the future at out-of-state disposal sites.  Plaintiff also claims that its members who operate out-of-state waste disposal sites will be unable to participate in the waste disposal market for Daviess County.

## II.  DISCUSSION

### A.   STANDING

This Court has an independent obligation to determine whether it has subject matter jurisdiction over a case, including whether Plaintiff meets the requirements of constitutional and prudential standing. *In re Cannon*, 277 F.3d 838, 852 (6th Cir. 2002). This Court reviews these standing issues *de novo. Id.* (citing *Johnson v. Econ. Dev. Corp. of the County of Oakland*, 241 F.3d 501, 507 (6th Cir. 2001)).

#### 1.     Constitutional Standing

Under Article III, Plaintiff must demonstrate three components to establish standing: "(1) an injury in fact that is actual or threatened; (2) a causal connection between the defendants' conduct and the alleged injury; and (3) a substantial likelihood that the injury will be redressed by a favorable decision." *Huish Detergents, Inc. v. Warren County*, 214 F.3d 707, 710 (6th Cir. 2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

We find that Plaintiff has established constitutional standing. With respect to the first element, NSWMA members who are waste collectors in Daviess County would be prohibited from contracting with less expensive waste disposal sites under the Ordinance; in fact, member Republic, a waste collector in the county, also owns a waste disposal facility that it would be unable to use. Moreover, NSWMA members who own waste disposal sites cannot contract with waste collectors for disposal of solid waste that is generated within Daviess County. Thus, the Ordinance would work an actual injury on NSWMA members. With respect to the second element, a causal connection exists between Defendant's conduct and the injury; without the Ordinance, NSWMA members would be free to contract to dispose of waste at sites other than the County-owned disposal site or transfer station. With respect to the third element, a favorable decision would redress Plaintiff's injury, as an injunction against the enforcement of the Ordinance would allow NSWMA members to freely contract for waste disposal services.

#### 2.     Prudential Standing

In addition to the Article III requirements, Plaintiff must prove prudential standing; specifically, Plaintiff must demonstrate that the interest that it seeks to protect is "'within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit.'" *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 162 (1997)). Here, Plaintiff claims Defendant's Ordinance is in violation of the dormant Commerce Clause. The Supreme Court has explained that "[t]he central rationale for the rule against discrimination [under the dormant Commerce Clause] is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." *C&A Carbone, Inc. v. Clarkstown*, 511 U.S. 383, 390 (1994).

We find that Plaintiff has met the prudential standing requirement. This Court has specifically held that the Commerce Clause protects a party's right to contract with an out-of-state waste disposal provider.[1] *Huish Detergents*, 214 F.3d at 711 ("In making this claim, [the plaintiff]

---

[1]The fact that Plaintiff has not shown that waste generated within Daviess County has actually crossed state lines is of no import with respect to prudential standing; the Commerce Clause protects the right to contract across state lines, not just the actual movement of goods or services across state lines. *See Huish Detergents*, 214 F.3d at 710-11. While one other circuit has seemingly required such actual movement, *see Nat'l Solid Waste Mgmt. Assoc. v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 498-501 (5th Cir. 2004), the law of this Court recognizes prudential

is asserting its individual right . . . to purchase waste processing and disposal services across State boundaries, an interest that falls squarely within the zone of interests protected by the Commerce Clause.")

**B.      THE DISTRICT COURT DID NOT ERR WHEN IT FOUND THAT THE ORDINANCE WAS FACIALLY DISCRIMINATORY AGAINST INTERSTATE COMMERCE**

### 1.      Standard of Review

This Court reviews the district court's grant of summary judgment *de novo*. *Odle v. Decatur County*, 421 F.3d 386, 389 (6th Cir. 2005) (citation omitted). The moving party must show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court "must view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party." *Cummings v. City of Akron*, 418 F.3d 676, 682 (6th Cir. 2005) (internal quotations and citation omitted).

### 2.      Analysis

The district court did not err when it found that the Ordinance was facially discriminatory against interstate commerce. The Ordinance, in practical terms, is no different than other local laws struck down by the Supreme Court and this Court as unconstitutional.

#### a.      Legal Framework

The United States Constitution gives Congress the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. While the Constitution does not directly speak to the states' power to regulate commerce amongst themselves, the Supreme Court has long interpreted the Constitution as not only granting power to Congress to regulate interstate commerce, but also denying that same power to the states. *See generally Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1 (1824); *H.P. Hood & Sons v. Du Mond*, 336 U.S. 525 (1949). As a result, this "dormant" Commerce Clause "limits the actions of municipalities . . . where such actions 'burden interstate commerce or impede its free flow.'"[2] *Waste Mgmt., Inc. v. Metro. Gov't*, 130 F.3d 731, 735 (6th Cir. 1997) (quoting *Carbone*, 511 U.S. at 389).

By its nature, the dormant Commerce Clause only disallows local *regulation* of interstate commerce. If a local government action is market participation, as opposed to market regulation, then the action is not barred by the dormant Commerce Clause. *Huish Detergents*, 214 F.3d at 714. We agree with the Second Circuit that the proper inquiry to determine if a local government is engaged in market regulation is if "it exercises governmental powers that are unavailable to private parties. . . . Classic hallmarks of government regulation include the threatened imposition of fines and/or jail terms to compel behavior." *United Haulers Assoc., Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 261 F.3d 245, 255 (2d Cir. 2001) (citation omitted).

---

standing where the plaintiff seeks to protect its right to contract for or purchase out-of-state goods or services.

[2]The dormant Commerce Clause must still be considered even in cases where there is a substantial local interest, as explained *infra*. *Amici* spend the majority of their brief extolling the virtues of flow control regulations in today's complex waste management landscape; however, the practicality of a regulation is hardly sufficient to correct its unconstitutional nature. Furthermore, if *amici* believe that the dormant Commerce Clause should not apply in the waste management context, *amici* need not endure the burden of constitutional amendment to achieve their ends; they can simply petition Congress, as Congress may approve of state and local regulations of interstate commerce.

If the local government meets this threshold inquiry and is engaged in regulation of interstate commerce, then the Court must determine whether the regulation discriminates against interstate commerce, or whether it "regulates evenhandedly." *Huish Detergents*, 214 F.3d at 712-13. "If an ordinance discriminates against interstate commerce by treating in-state and out-of-state interests differently, benefitting the former and burdening the latter, it is *per se* invalid unless the State has 'no other means to advance a legitimate local interest.'" *Id.* (quoting *Carbone*, 511 U.S. at 392). "On the other hand, if the law regulates evenhandedly, it will be upheld unless the burden it imposes on interstate commerce is 'clearly excessive in relation to the putative local benefits.'" *Id.* at 713 (quoting *Carbone*, 511 U.S. at 390.) This is known as the *Pike* balancing test. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

With this framework in mind, this Court addresses three relevant waste management cases. In *C&A Carbone v. Clarkstown*, the Supreme Court addressed the constitutionality of a town ordinance. There, the town of Clarkstown decided to build a waste transfer station, as it closed its local landfill in cooperation with the State of New York. 511 U.S. at 387. The transfer station's purpose was to receive bulk solid waste, separate the waste between recyclable and nonrecyclable waste, and process these two types of waste for transport to the appropriate ultimate disposal destinations. *Id.*

The town hired a private contractor to build the transfer station. *Id.* Instead of paying for the transfer station with municipal funds, the town gave the private contractor the right to operate the station for five years. *Id.* At the end of the five years, the private contractor would sell the transfer station to the town for a nominal amount. *Id.* The town also guaranteed a minimum waste flow of 120,000 tons, and the town authorized the private contractor to charge a "tipping fee" of $81 per ton. *Id.* If the actual waste flow was less than 120,000 tons, the town would pay for the difference in revenues. *Id.*

In order to make good on its guarantee to the private contractor, the town passed an ordinance that required all nonhazardous solid waste from the town to be brought for processing to the transfer station. *Id.* The plaintiff, a recycling center in the town, brought suit. *Id.* at 387-88.

The Supreme Court found that the ordinance was unconstitutional. The Court held that the ordinance discriminated against interstate commerce, because "[i]t hoard[ed] solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility." *Id.* at 392. In other words, without the ordinance, waste collectors would be free to take the waste to any number of transfer and disposal sites, including out-of-state sites. The ordinance thus "deprive[d] out-of-state businesses of access to a local market." *Id.* at 389. The court found that the case did not fall into a narrow exception "in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *Id.* at 392.

In *Waste Mgmt., Inc.*, this Court followed the Supreme Court's lead in *Carbone*. There, the county enacted a "flow-control" regulation that required, among other things, that all residential waste collected within the county be disposed of at a "waste-to-energy" facility owned by the county. 130 F.3d at 733. This Court found *Carbone* to be directly on point and held that the regulation discriminated against interstate commerce, and that the county could have engaged in alternative, nondiscriminatory actions to meet its proffered local concerns. *Id.* at 736.

In *Huish Detergents, Inc. v. Warren County*, the Court had a second opportunity to address a flow-control regulation. There, the county solicited competitive bids for the collection and processing of all municipal solid waste in Bowling Green, Kentucky. 214 F.3d at 708. Under the agreement, the contractor would have the exclusive right to collect solid waste for five years. *Id.* The city would not directly pay the contractor; instead, all entities generating solid waste were

required to use the contractor, and the contractor would collect its payment from these customers. The contractor was required to operate the city's transfer station and process all of the solid waste collected at the transfer station. *Id.* at 708-09. Finally, the contractor was required to dispose of all waste at a landfill approved and permitted by the state, "effectively prohibiting the use of out-of-state disposal sites." *Id.* at 709. After selecting the contractor, the county passed an ordinance that executed the agreement. *Id.*

This Court found the ordinance to be unconstitutional. With respect to the requirement that the contractor process all of the solid waste at the transfer station, the Court rejected the defendant's market participation argument. The defendant argued that because it was a market participant in that it was procuring waste collection services for one of its cities, it was exempt from the strictures of the dormant Commerce Clause, and could thus force the contractor to use a single transfer station. *Id.* at 715. This Court disagreed and ruled that the county was neither purchasing nor selling products or services. Instead, it was forcing all of the inhabitants of a city to purchase services from a contractor, a power that "far exceeded that which a private entity could accomplish on the free market." *Id.* at 716. Disposing of the defendant's market participation argument, the Court then ruled that the ordinance was the "functional equivalent" as the one in *Carbone*, in that it required processing services at the city's transfer station and "nowhere else." *Id.* The ordinance thus discriminated against interstate commerce; the Court further found that the ordinance did not fall into the narrow exception based on local interests. *Id.*

With respect to the requirement that the contractor dispose of the solid waste at an in-state site, the Court found that *Carbone* was equally applicable; the ordinance "violated the Commerce Clause by prohibiting out-of-state disposal." *Id.* at 716. Interestingly, the Court stated in dicta that even if the defendant were a market participant with respect to the collection or processing of waste, it could not regulate the downstream market of waste disposal.[3] *Id.*

Lastly, the Court readdressed the defendant's market participation argument. The Court found that had the defendant actually purchased the contractor's services with its own funds, it could have avoided scrutiny under the dormant Commerce Clause. *Id.* at 717. But by deciding to regulate the market, by forcing city residents to purchase the contractor's services, instead of participating in the market, the defendant "opened itself up" to such scrutiny. *Id.* Moreover, the fact that the defendant could have acted as a market participant to achieve the same ends did not save its ultimate decision to regulate the market in violation of the dormant Commerce Clause. *Id.* (quoting *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 98-99 (1984) (plurality opinion)).

### b.      Application to This Case

The three cases cited above leave little doubt that the Ordinance in this case discriminates against interstate commerce. By forcing Plaintiff's members to use Defendant's disposal and transfer facilities, the Ordinance would prohibit these members from using other in-state and out-of-state facilities. The Ordinance is thus facially discriminatory against out-of-state interests.[4]

---

[3] We agree that the defendant could not *regulate* the waste disposal market if it were only a market participant in the waste collection or processing markets; however, it could make a decision as a market participant that would duplicate the results of regulation. For example, if the defendant operated the transfer station as a market participant, it could choose where it ultimately disposed of the waste, such as an in-state disposal site.

[4] Defendant does not argue that it has no other means to advance a local interest; it only argues that the Ordinance is nondiscriminatory.

In response, Defendant makes a strange argument: "[Defendant] contends that its Ordinance affects both in-state and out-of-state entities the same. All haulers of solid waste that is generated in Daviess County must deposit waste in Daviess County's publicly owned landfill." (Def.'s Br. 15.) As Plaintiff points out, there is a difference between the market for waste collection and for waste disposal. We agree that the Ordinance does not discriminate against out-of-state waste collectors; however, that is not the point. The Ordinance discriminates against out-of-state waste disposal facilities, and this is dispositive with respect to this issue.

Defendant's argument that the Ordinance does not create a "bottleneck" also lacks merit. Defendant attempts to distinguish *Carbone* in that *Carbone* involved a waste transfer station, and the Ordinance here involves a waste disposal facility. Defendant's contention is that "[w]hen solid waste is delivered to a landfill for disposal, it is no longer in the stream of commerce." (Def.'s Br. 17.) This argument fails for two reasons. First, this Court has already held that *Carbone* applies to waste disposal facilities. *See Waste Mgmt.*, 130 F.3d at 736; *Huish Detergents*, 214 F.3d at 716. Second, *Carbone* is as applicable to disposal facilities as it is to transfer stations because "what makes garbage a profitable business is not its own worth but the fact that its possessor must pay to get rid of it. In other words, the article of commerce is not so much the solid waste itself, but rather the service of processing and disposing of it." *Carbone*, 511 U.S. at 390-91. In other words, the focus is not on the actual waste and its location in the steam of commerce; the focus is on the attendant services and whether the Ordinance constricts the open channels of commerce to these services. Here, the Ordinance does exactly that: by requiring disposal at Defendant's facility, out-of-state disposal service providers are shut out of the disposal market for waste generated in Daviess County.

Defendant's citations to purportedly analogous case law are likewise unconvincing and merit only a brief response. Defendant cites to *Maharg, Inc. v. Van Wert Solid Waste Mgmt. Dist.* for the proposition that the Ordinance is facially neutral. In that case, Ohio law authorized the county waste management board to make "facility designations." 249 F.3d 544, 547 (6th Cir. 2001). This authorization "allow[ed] the board to 'designate solid waste disposal, transfer, or resource recovery facilities . . . where solid wastes generated within or transported into the district shall be taken for disposal.'" *Id.* (quoting Ohio Rev. Code Ann. § 343.014(A)). Van Wert County then adopted a resolution whereby it solicited bids from in-state and out-of-state waste facilities to become "designated" facilities. *Id.*

This Court upheld the resolution because it was not "territorially based," as the bidding process was equally open to in-state and out-of-state waste facilities. *Id.* at 551. The Ordinance in this case does not open the waste disposal market equally to in-state and out-of-state interests; it closes the market to all except Defendant's waste disposal facility. Thus, there is not even a remote analogy to be drawn between *Maharg* and the instant case.

*Eastern Kentucky Res. v. Fiscal Court of Magoffin County* is also inapposite. There, this Court upheld Kentucky statutes that required local governments to create solid waste management plans for municipal solid waste and to identify any additional capacity for "out-of-area" solid waste. 127 F.3d 532, 541 (6th Cir. 1997) (quoting Ky. Rev. Stat. Ann. § 224.43-345(1)(l)). The Court found that although the statute distinguished between in-area and out-of-area waste, the statute did not provide for different treatment between the two categories. *Id.* In this case, there is an absolute difference in treatment; the Ordinance completely disallows out-of-state waste disposal services.

Finally, Defendant relies on the district court case of *Nat'l Solid Wastes Mgmt. Assoc. v. Granholm*. There, the plaintiff contested the legality of a set of Michigan statutes that created disposal requirements for Michigan landfills. 344 F. Supp. 2d 559, 563-64 (E.D. Mich. 2004). Under the statutes, solid waste generated in Michigan automatically qualified for disposal in

Michigan landfills, whereas solid waste generated in other states did not automatically qualify, but instead required additional procedures. *Id.* The district court found that the statutes "contain no overt distinctions between in-state and out-of-state waste, nor do they expressly bar the entry of out-of-state waste into Michigan;" as a result, the statutes were facially neutral. *Id.* at 566. The Ordinance in this case, on the other hand, expressly bars out-of-state waste disposal providers from the Daviess County waste disposal market.

**C.     THE DISTRICT COURT DID NOT ERR WHEN IT FOUND THAT DEFENDANT DID NOT ELIMINATE THE DISPOSAL MARKET FOR SOLID WASTE**

**1.     Standard of Review**

The standard of review for the district court's grant of summary judgment is set out above.

**2.     Analysis**

**a.     Legal Framework**

Defendant's argument with respect to this issue centers entirely around the Second Circuit case of *USA Recycling, Inc. v. Town of Babylon*. In that case, the town built an incinerator as a waste disposal facility. 66 F.3d 1272, 1277 (2d Cir. 1995). The town raised funds via local bonds and hired a private contractor to build the incinerator. *Id.* The private contractor then leased the incinerator from the town, and the town paid the private contractor to operate the facility. *Id.*

Originally, the town passed a flow control ordinance that required all solid waste collected from the town to be disposed of at the town incinerator. *Id.* at 1278. In the wake of *Carbone*, the constitutionality of that practice was in great doubt. *Id.* In response, the town decided to purchase commercial waste collection services from one provider by utilizing a competitive bidding procedure open to in-state and out-of-state waste collection service providers. *Id.* at 1278-79. The key fact is that the town paid for the waste collection services itself; it did not force its commercial residents to purchase the services from the winning bidder. *Id.* The town passed on the cost by assessing an "annual benefit assessment" against each benefitted commercial parcel. *Id.*

In conjunction with this new policy for waste collection, the town also allowed the waste collector to dispose of 96,000 tons of solid waste per year at the incinerator for no charge. *Id.* If the waste collector disposed of more than this amount at the incinerator, the waste collector would be forced to pay the market rate at the incinerator for waste beyond this amount. *Id.* The contract also had a provision that gave the town the right to direct the waste collector to the disposal site of its own choice, but then the town would have to pay the disposal fee. *Id.*

The plaintiffs filed suit against the town, challenging both the waste collection and the waste disposal provisions of the contract. *Id.*

With respect to the waste collection aspect of the contract, the Second Circuit found that the town acted both as a market participant, as it purchased waste collection services, and as a market regulator, as it prevented any other entity from providing waste collection services other than the single contractor selected. *Id.* at 1282. Because the town effectively entered into regulation of the waste collection market, the court undertook the dormant Commerce Clause analysis.

The court found that the contract did not discriminate against interstate commerce. It found that:

> No one enjoys a monopoly position selling garbage collection services in Babylon's commercial garbage market, because the Town has eliminated the market entirely. Not even the Town itself remains as a *seller* in the market. Although the Town is now the lone *provider* of garbage collection services in the District, it does so as a local government providing services to those within its jurisdiction, not as a business selling to a captive customer case. . . . In Babylon, local businesses do not buy services from anyone. . . . Although taxpayers in the District ultimately foot the bill for these garbage services–just as they foot the bill for street sweeping, street lighting, sewage treatment, public schools, and police and fire protection, to name just a few other basic services provided by local governments–the payment of taxes in return for municipal services is not comparable to a forced business transaction . . . . In short, because Babylon is not selling anything, it cannot be considered to be a favored single local proprietor as in *Carbone*.

*Id.* at 1283 (emphasis supplied). Instead of forcing its commercial residents to purchase waste collection services from a single provider, the town eliminated the market in the sense that the commercial residents no longer purchased waste collection services, and waste collection service providers no longer sold these services to the commercial residents. The town paid for the service itself, and then passed the cost on to its commercial residents.

With respect to the waste disposal aspect of the contract, the court found that the town could legally offer free disposal services to its selected waste collection provider, because it was a market participant. The town owned the incinerator; moreover, it paid a private contractor to operate the incinerator; in essence, the town had "exclusive rights to dispose of waste [at the incinerator]." *Id.* at 1288-89. As the court viewed the situation,

> [t]he Town may exercise [its waste disposal] rights as it sees fit. It could sell those rights on the open market. . . . Instead, the Town has chosen to give away those rights for free, to dispose of garbage generated by town businesses. Babylon's decision . . . therefore constitutes municipal participation in the waste disposal market.

*Id.* at 1289.

### b.          Application to This Case

*Babylon* is in diametric opposition to the facts presented in this case. Defendant claims that, like the contract in Babylon, the Ordinance would merely "eliminate[ ] the market for solid waste disposal." (Def.'s Br. 24.) Despite Defendant's contention otherwise, the market for solid waste disposal would continue to exist in Daviess County under the Ordinance, and Defendant would have a monopoly on that market. Here, Defendant would be forcing waste collectors to purchase its waste disposal services; Defendant would remain as the lone seller in this market as a result of its regulation. A market is where a seller sells goods or services, and a buyer buys goods or services. In *Babylon*, the contract between the town and the private contractor eliminated the waste collection market because the waste collectors no longer sold their services to commercial residents, and commercial residents no longer purchased these services from the waste collectors. Instead, the town purchased these services and provided them for the benefit of its commercial residents, just as with countless other government benefits.

In this case, waste collectors would be purchasing waste disposal services from Defendant under the Ordinance, and Defendant would be selling waste disposal services to waste collectors.

Thus, the proposition that the Ordinance would eliminate the market is absurd. The Ordinance would not eliminate the market; instead, it would make Defendant the only player in the market.

The waste disposal analogue to the waste collection system in *Babylon* would be if Defendant's waste disposal facility charged nothing for the disposal of waste generated within Daviess County, and then passed this cost on to its residents via taxes. If this were the case, then there would be no sale or purchase of waste disposal services, and thus there would be no market. If this were the case, then the system would not discriminate against interstate commerce. Unfortunately, this is not the system that would be implemented by the Ordinance.[5]

Defendant relies on *Harvey & Harvey Inc. v. County of Chester* and *Houlton Citizens' Coalition v. Town of Houlton* for the proposition that a municipality could eliminate the market for waste services. Both cases are examples where the court endorsed the principle that a municipality's selection of a waste service provider (be it collection or disposal) does not run afoul of the dormant Commerce Clause if the selection process was open to in-state and out-of-state contractors, a process that was obviously different from the unilateral selection of Defendant's landfill as the sole waste disposal provider in this case. *Harvey & Harvey*, 68 F.3d 788, 802 (3d Cir. 1995) (waste disposal); *Houlton*, 175 F.3d 178, 188 (1st Cir. 1999) (waste collection and processing). Furthermore, neither of these cases turned on the elimination of a market: *Harvey & Harvey* is a case where the municipality designated waste disposal sites; it did not purchase waste disposal services on behalf of its citizens, so no market elimination occurred. 68 F.3d at 794-95. *Houlton* is a case where the municipality did purchase waste collection and processing services on behalf of its citizens; however, the First Circuit explicitly decided not to base its decision on the market elimination analysis of *Babylon*; instead, the court found that because the selection process for a waste collector and processor was competitive and open to out-of-state businesses, the measure was valid under the Commerce Clause. 175 F.3d at 187-89. These two cases do not support Defendant's position that the Ordinance would merely eliminate the waste disposal market in Daviess County.

**D.      THIS COURT DECLINES TO ADOPT THE SECOND CIRCUIT'S PUBLIC-PRIVATE OWNERSHIP DISTINCTION WITH RESPECT TO THE DORMANT COMMERCE CLAUSE**

**1.      Standard of Review**

The standard of review for the district court's grant of summary judgment is set out above.

**2.      Analysis**

**a.      Legal Framework**

In *United Haulers Assoc., Inc. v. Oneida-Herkimer Solid Waste Mgmt. Authority*, the Second Circuit examined the constitutionality of a county ordinance that required waste collectors to dispose of solid waste at approved processing sites designated by the county. 261 F.3d 245, 249-50 (2d Cir. 2001). The county owned all of the designated processing sites. *Id.* at 250.

---

[5]Defendant seems to place weight in the fact that it "purchased" the Daviess County landfill in that it invested public funds in its construction. Defendant then attempts to analogize this purchase to the purchase of disposal services made by the town in *Babylon*. This Court agrees that Defendant is a market participant in the sense that it operates the County landfill; however, this is irrelevant. The operation of the landfill is not the concern; the concern is the regulatory behavior as prescribed in the Ordinance that requires waste collectors to purchase the landfill's services. Unlike the town of Babylon, Defendant would not be acting only as a market participant; it would also be regulating the waste disposal market to benefit its participation.

In a surprising decision, the Second Circuit found that the ordinance did not discriminate against interstate commerce. The court drew a distinction between private ownership and public ownership: in a case where the regulation benefits a facility owned by the municipality, the regulation is nondiscriminatory. *Id.* at 263. The court based its decision first on the language of *Carbone*. The court noted that the facility in *Carbone* was privately owned. *Id.* at 259. The court also pointed to language that local governments "'may not use their regulatory power to favor *local enterprise*.'" *Id.* at 258-59 (quoting *Carbone*, 511 U.S. at 394) (emphasis in the original). Moreover, the court characterized the struggle between the majority, concurrence, and dissent in *Carbone* as one that wrestled with the question of "*whether* the favored facility was public or private." *Id.* at 259 (emphasis in the original). The concurrence and the dissent viewed the facility in *Carbone* as one that was publicly owned, so it was nondiscriminatory in that it discriminated equally against in-state and out-of-state facilities; the concurrence and the dissent then analyzed the regulation under the *Pike* balancing test. *Id.* (citing *Carbone*, 511 U.S. at 402-03 (O'Connor, J., concurring); 511 U.S. at 410-30 (Souter, J., dissenting)).

The court then examined the language of other dormant Commerce Clause cases, and it found that those cases were primarily concerned with the protection of local businesses at the expense of out-of-state businesses. *Id.* at 260-61.

The court found that, from a policy perspective, a local regulation that favored a local municipality, as opposed to local businesses, was less likely to be protectionist, and was less likely to engender negative reaction from neighboring areas. *Id.* at 261.

Having found that the ordinance did not discriminate against interstate commerce, the court remanded the case to the district court to conduct the *Pike* balancing. *Id.* at 263-64.

### b.      Application to This Case

This Court has already found dormant Commerce Clause violations in cases where the facility was publicly owned. *See Waste Mgmt.*, 130 F.3d at 736; *Huish Detergents*, 214 F.3d at 716. Those cases did not directly address the public-private ownership issue raised by *United Haulers*; however, an adoption by this Court of the public-private ownership distinction, as suggested by Defendant and *amici*, would amount to the overturning of our prior decisions, as a necessary implication of those decisions was that public ownership did not change the dormant Commerce Clause inquiry. This Court does not have the ability to take such action. *See LRL Properties v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1105 n.2 (6th Cir. 1995) ("It is well-settled law of this Circuit that a panel of this Court cannot overrule the decision of another panel." (internal quotations and citation omitted)).

Moreover, this Court respectfully disagrees with the Second Circuit on the proposition that *Carbone* lends support for the public-private distinction drawn by that court. For every sentence in the decision that can be interpreted as supporting such a distinction, there is a sentence that can be interpreted in opposition. For example, the Court focused on the fact that "the ordinance prevents everyone except the favored local operator from performing the initial processing step. The ordinance thus deprives *out-of-state businesses of access to a local market*." *Carbone*, 511 U.S. at 390 (emphasis supplied). There, the focus of the court was on the harm to out-of-state businesses and the local market, as opposed to the benefit conferred to the local provider. Importantly, this harm would occur regardless of who owned the benefitted facility. In further support that the focus of the dormant Commerce Clause inquiry was on the economic harm to out-of-state actors and the local market, the Court stated, "The *essential vice* in laws of this sort is that they bar the import of the processing service." *Id.* at 392 (emphasis supplied). In other words, the crux of the inquiry is

whether the local ordinance burdens interstate commerce, not whether the local entity benefitted by the ordinance is publicly owned.

Even in the language of the *United Haulers* decision itself, the court recognized this focus on the effects on foreign businesses by isolating the local market:

> Our system, fostered by the Commerce Clause, is that every farmer and craftsmen shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them.

*United Haulers*, 262 F.3d at 254 (quoting *H.P. Hood & Sons*, 336 U.S. at 539). Free access for out-of-state businesses to the local market is "the rationale underlying the judicially created dormant Commerce Clause." *Id.*

In our view, the Second Circuit placed too much importance on phrases like "rival businesses" and "local enterprise" as used by the *Carbone* Court. *See id.* at 258-59. A municipality can be considered a local business in competition with out-of-state businesses, and a municipality can participate in local enterprise. While the Supreme Court expressed concerns of aiding local enterprise at the expense of rival businesses, these concerns remain regardless of whether the municipality owns the favored business.[6]

This fact is implicit in the *Carbone* decision. We disagree with the Second Circuit that the point of contention in *Carbone* between the majority on the one hand, and the concurrence and the dissent on the other, was *whether* the waste transfer facility was public or private. Both the concurrence and the dissent agreed that because the waste transfer facility was publicly owned, it treated all other businesses, in-state and out-of-state, equally. *See supra*. The analysis of four Justices thus turned on the public-private distinction relied on by the Second Circuit; however, the majority's decision was not based on the categorization of the waste transfer facility as a private business.[7]

---

[6]The Second Circuit also placed stock in the Supreme Court's use of the phrase "single local proprietor" in *Carbone* to support its public-private ownership distinction. *Id.* at 258. We fail to see the logical connection; a proprietor is defined simply as "[a]n owner, esp. one who runs a business." Black's Law Dictionary 1236 (7th ed. 1999). There is absolutely no denotation that a proprietor can only be a private entity. Moreover, when the Supreme Court spoke of the "single local proprietor," its focus was on the harm to out-of-state competition:

> The only conceivable distinction from [the cited dormant Commerce Clause cases] is that the flow control ordinance favors a single local provider. But this difference just makes the protectionist effect of the ordinance more acute. In *Dean Milk*, the local processing requirement at least permitted pasteurizers within five miles of the city to compete. An out-of-state pastuerizer who wanted access to that market might have built a pasteurizing facility within the radius. The flow control ordinance at issue here squelches competition in the waste-processing service altogether, leaving no room for investment from outside.

*Carbone*, 511 U.S. at 392. The Supreme Court's concern about squelching competition altogether, leaving no room for outside investment, exists in the present case under the Ordinance; the fact that Defendant would be the single local proprietor does not in any way mitigate this explicit harm.

[7]The Second Circuit considered it unclear whether the *Carbone* majority "either rejected or accepted the public/private distinction." *United Haulers*, 261 F.3d at 260. But not even the *Carbone* dissent was willing to adopt this view, though it had every incentive to do so. Had the dissent thought it plausible to read the majority's reasoning as consistent with the public-private distinction, it never would have characterized the majority as rejecting the distinction outright. *See Carbone*, 511 U.S. at 420 (Souter, J., dissenting) ("The majority ignores this distinction between public and private enterprise."). The dissent thought that the public nature of the favored transfer facility rendered the

From the facts of *Carbone*, the waste transfer facility was quite clearly owned in fact by the municipality. Though possessed and operated by the private contractor who built the facility for the first five years of operation, the entire arrangement between the county and the private contractor dealt only with the form of payment to the private contractor for building the transfer station for the town; there was no real doubt as to who actually owned the facility. Contrary to the declaration of the Second Circuit, the Supreme Court did not "repeatedly reference[ ] the private nature of the favored facility," *id.* at 258; in fact, the Court stated, "The object of this arrangement was to amortize the cost of the transfer station: The town would finance *its* new facility with the income generated by the tipping fees." *Carbone*, 511 U.S. at 387 (emphasis supplied). At most, the private contractor was an agent of the town, collecting tipping fees on behalf of the town and then applying these fees to the construction costs that were not directly charged to the town because of the agreement.

Other language denoted an understanding by the majority that the facility was publicly owned: the Court's characterization of the "town-sponsored facility," the fact that "the flow control ordinance is a financing measure," the reference to the facility as "its [*i.e.*, the town's] project." *Id.* at 393-94. The majority did not find that the ordinance discriminated against interstate commerce because the waste transfer facility was privately owned, and we find that the Supreme Court implicitly rejected the public-private distinction.

The Second Circuit's interpretation of other dormant Commerce Clause cases was similarly strained. We assume the truth of the statement that "[t]he common thread in the Court's dormant Commerce Clause jurisprudence . . . is that a local law discriminates against interstate commerce when it hoards local resources in a manner that favors local business, industry or investment over out-of-state competition." *United Haulers*, 261 F.3d at 261. But again, Daviess County is acting as a local business in the local industry of waste disposal. Not to belabor the point, but under the Ordinance, Defendant would be acting in a dual role: as a local business selling waste disposal services, and as a local government hoarding "waste, and the demand to get rid of it, for the benefit" of this business. *Carbone*, 511 U.S. at 392. The fact that Defendant acts as both a business and a government, as opposed to just a government, does not cloak its facially protectionist activity from the appropriate scrutiny under the Commerce Clause.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order.

---

ordinance to be non-discriminatory; it thus considered the public-private distinction of constitutional import. It makes no sense to suggest that the dissent, rather than characterizing the majority's holding narrowly, as concerning only private entities, would have broadened the majority's holding to reject a distinction that it itself advocated.