**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0418n.06
Filed: June 19, 2007

**No. 06-5414**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION, )
                     )
    Plaintiff-Appellant, )
                     ) ON APPEAL FROM THE UNITED
v. ) STATES DISTRICT COURT FOR THE
                     ) MIDDLE DISTRICT OF TENNESSEE
LUCENT TECHNOLOGIES, INC., )
                     )
    Defendant-Appellee. )
                     )

Before: ROGERS and COOK, Circuit Judges; and DOWD, District Judge.[*]

DOWD, District Judge. This is an appeal from the January 20, 2006 order of the district court granting summary judgment in favor of the defendant-appellee on a claim of race discrimination brought by the plaintiff-appellant on behalf of John R. Primm. This court has jurisdiction under 28 U.S.C. § 1291. For the reasons discussed below, we affirm.

I

John Primm, an African-American, was hired in 1987 by AT&T, the predecessor of Lucent Technologies, Inc., as a communications installer. In August of 1997, Area Manager Bob Baumer (Caucasian) promoted Primm to Operations Supervisor (OS) at the management level of MA5 in

---

[*]The Honorable David D. Dowd, Jr., Senior United States District Judge for the Northern District of Ohio, sitting by designation.

Nashville. At the time, Richard Atchley (Caucasian) held an OS position in Knoxville; however, in September 2000, Atchley was promoted to Area Manager and Primm began reporting to him. Primm held the MA5 OS position in the Nashville area from August 1997 until his termination in December 2003.

As an OS, Primm was responsible for overseeing approximately sixteen communications installers. He was the only African-American manager in Tennessee. At all relevant times, Atchley was Primm's supervisor. Atchley reported to James Gilliam, the Operations Director (Caucasian), who was responsible for several states, including Tennessee. Gilliam, in turn, reported to Christopher Camacho, Director of Installations (Caucasian).

Not long after Atchley was promoted to Area Manager in 2000, he hired Kimberly Guinn (Caucasian) as an installation supervisor. In 2001, Atchley promoted Guinn to an OS MA5 position. Then, in the Spring of 2003, Atchley placed Guinn in a newly-created position in Nashville called the Installation Sales Representative ("ISR"). The ISR was also an MA5 position. In fact, Atchley testified that, in his view, "she was still an operations supervisor performing other type duties[.]" (JA 286). As an ISR, Guinn pursued new sales in addition to regular orders; she contacted customers, but did not supervise installers. The ISR position was a managerial level counterpart to the OS position; both were MA5 level, but they encompassed different duties.

From 2000 to 2004, Lucent reduced its workforce from 135,000 employees to 35,000 in response to deteriorating financial conditions. Reductions would typically begin at the installer level, a unionized position. These reductions would, in turn, trigger management reductions since fewer

supervisors were needed to oversee fewer installers. The management reductions were accomplished through a Force Management Program ("FMP"). Typically, upper management would determine an appropriate (i.e., efficient) ratio of installers to installation management and would communicate down the chain of command that management positions (called "expense positions") would need to be eliminated.[1] Eventually, Area Managers were instructed to rate the skills of individuals reporting to them using a skills matrix and a rating scale of 1 (high), 2 (medium) or 3 (low). The Human Resources department would define the "universe" of employees who could be considered for termination, in terms of geographic location, level, and job title. The employee(s) within that universe who had the highest score on the Area Manager's rating was identified for termination.

In late 2003, Lucent's upper management decided to eliminate sixty "expense positions." Area Manager Atchley was told that he had to reduce by one the number of MA5 OS positions reporting to him in Nashville. Atchley had a meeting with his Nashville supervisors on November 20, 2003; this included Sam Colbert, MA5 OS (Caucasian), Primm, MA5 OS (African-American), Stephen Letson, MA3 OS (Caucasian), and Kimberly Guinn, MA5 ISR (Caucasian). Of this group, only Colbert and Primm were within the "universe" ultimately identified as eligible for termination. Atchley asked if any of the supervisors would be willing to "take back their tools," meaning agree to a demotion back to installer in the event they were selected for termination. Guinn and Colbert indicated that they would accept a demotion, if it came to that. Primm did not say anything during

---

[1]Variables such as the number of installers in various areas, the number of management in those same areas, the geographic scope of the areas, and the business generated in each area would typically be considered.

- 3 -

the meeting. Since Atchley had already completed annual evaluations, he knew that Primm would be the likely termination. After the meeting Atchley again asked Primm if he would "take back his tools." Primm answered in the negative, indicating that he would sooner start his own business.

On December 15, 2003, Atchley announced he had accepted a transfer to another state. Before he left, he sent Gilliam the ratings for all the MA5s in Memphis, Nashville and Knoxville. Barbara Boxdorfer, in Human Resources, put the data from Atchley's skills matrices into a spreadsheet. She included only Colbert and Primm, the two employees in the MA5 OS position targeted by management for elimination. Based on the fact that he had the lower rating on the spreadsheet, Primm was terminated on December 18, 2003.[2]

Following Primm's termination, his duties were absorbed by Guinn and Letson. This was a disputed matter below. EEOC argues that Guinn replaced Primm as an OS and that her ISR job was virtually eliminated almost immediately. However, the record requires the conclusion that Guinn initially took over at least part of Primm's OS job, in addition to her ISR duties. After about four months, she complained to her supervisor that it was too much to do both jobs. At that time, Guinn ceased performing her ISR duties. The ISR position was eliminated company-wide in 2004.

Primm filed a charge of discrimination with the EEOC on December 31, 2003, and the Commission filed suit on his behalf, alleging that Lucent discriminated against Primm on the basis

---

[2]This was the third time that MA5 OS positions in Nashville were targeted for reduction. During the first two FMPs, white employees were terminated and Primm survived. It was only on this third FMP that Primm was terminated.

of race in violation of Title VII of the Civil Rights Act of 1964. The district court granted Lucent's

motion for summary judgment and EEOC timely appealed.

III

A

This court reviews a grant of summary judgment *de novo*, drawing all inferences in the light

most favorable to the nonmovant and affirming summary judgment only if there is no genuine issue

as to any material fact. *Nat'l Solid Wastes Mgmt. Ass'n v. Daviess County*, 434 F.3d 898, 902 (6th

Cir. 2006); *Smith v. Wal-Mart Stores, Inc.*, 167 F.3d 286, 289 (6th Cir. 1999); Fed. R. Civ. P. 56(c).

Summary judgment is not appropriate "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To evaluate a Title VII race discrimination claim, this court typically applies the familiar

*McDonnell Douglas* burden-shifting test. *See Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir.

2001). Plaintiff has the initial burden of establishing a *prima facie* case of racial discrimination.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). In this case, there is a dispute as to

which elements make up the *prima facie* case, because there is a dispute as to whether or not Primm

was terminated as a result of a reduction in force (RIF). Whereas a Title VII plaintiff would

ordinarily have to prove that he or she was replaced by a person outside the protected class, when

a plaintiff is terminated in the context of a RIF, that element need not be shown; rather, the plaintiff

is required to produce "additional direct, circumstantial, or statistical evidence that [race] was a

factor in his termination." *LaGrant v. Gulf & W. Mfg. Co.*, 748 F.2d 1087, 1091 (6th Cir. 1984).

If the plaintiff makes a *prima facie* showing of discrimination, the defendant then has the burden "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *See McDonnell Douglas*, 411 U.S. at 802; *Braithwaite*, 258 F.3d at 493. Finally, if the defendant successfully articulates a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff has the burden to show that the defendant's reason for the adverse employment action is pretext for what is, in essence, unlawful racial discrimination. *See McDonnell Douglas*, 411 U.S. at 804; *Braithwaite*, 258 F.3d at 493. To establish pretext, the plaintiff must demonstrate by a preponderance of the evidence "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chems.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (quoting *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir.1993)). If a plaintiff can show that the defendant's proffered, nondiscriminatory reason is pretextual, the trier of fact may infer discrimination. *See Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). Nevertheless, the ultimate burden of proof to show discrimination remains on the plaintiff at all times. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253-56 (1981).

B

The district court granted Lucent's motion for summary judgment, concluding that, even assuming the plaintiff had established a *prima facie* case of discrimination, the defendant had articulated a legitimate, nondiscriminatory reason for its employment decision, which the plaintiff

had failed to establish was a mere pretext for discrimination. The district court did not decide

whether Primm had been RIFed, requiring the heightened standard of proof; rather it assumed

*arguendo* that EEOC had established a *prima facie* case and proceeded to analyze the remainder of

the *McDonnell Douglas* test, ultimately concluding that EEOC had failed to establish that the

legitimate business reason articulated by Lucent as the reason for Primm's termination was a pretext

for discrimination.

Like the district court, we find no need to determine which *prima facie* case applies because

we conclude that the case does not survive on the question of pretext.[3]

EEOC does not clearly articulate which of the *Manzer* elements it has attempted to establish,

but it appears to suggest that the reason given for Primm's termination was factually false. EEOC

argues that a reasonable jury could find that the staff reduction was manipulated to target Primm, the

only African-American manager, and to preserve the jobs of Primm's white colleagues, particularly

Guinn, and that the reduction actually was meant to target the ISR position and not Primm's OS

position. However, EEOC points to absolutely nothing in the record which would suggest that, had

the ISR position been included in the "universe" of positions considered for termination, Primm

would not have still had the lowest score. In fact, Primm himself testified that he would have no way

of knowing how he compared to other employees or whether he performed better or worse than

---

[3]The purpose of a *prima facie* case is simply to set up an inference of discrimination in those cases where there is no direct evidence. The analysis does not end when the *prima facie* case is established. Therefore, even if the district court erred in some way by failing to articulate which *prima facie* case applied, the error would be harmless since the plaintiff cannot survive the remainder of the analysis.

others.  There is simply no evidence in the record to suggest that Primm did *not* receive the lowest ranking or, alternatively, that he ranked better than any others.  In other words, there is nothing in the record to show that it is factually false that Primm scored the lowest of all MA5 positions.

Even if there were some cause to find fault with defendant's stated reason for selecting Primm for termination, in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000), the Supreme Court held that "it is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." (quoting *St. Mary's Honor Center*, 509 U.S. at 519).  The mere fact that Primm was African-American is not enough to establish that he was someone targeted for termination.  EEOC certainly cannot be arguing that Primm's race alone somehow permanently insulated him from ever being terminated, no matter how badly he might have performed.[4]

EEOC argues that defendant did not follow its own FMP procedures and that this fact requires an inference of pretext.  We are not convinced that the procedures were not followed.  EEOC argues that Atchley used annual performance reviews rather than the FMP skills matrix to rank his direct-reports.  Atchley testified that his annual evaluations were based on a skills matrix.  Nobody has pointed to any substantial differences between the FMP matrix and the one purportedly used by Atchley.  EEOC also argues that Primm was actually selected before the "universe" was created by the HR Department.  That, too, is not clear from the record.  However, even if both these

---

[4]No one is suggesting that Primm was a bad employee.  As already noted, Lucent had cut its workforce from 135,000 to 35,000.  The fact that it finally got down to cutting even fairly good employees is proof of no more than Lucent's dire financial condition.

assertions were true, "an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." *White v. Columbus Metro. Housing Auth.*, 429 F.3d 232, 246 (6th Cir. 2005); *Skalka v. Fernald Env. Rest. Mgt. Corp.*, 178 F.3d 414, 422 (6th Cir. 1999). And, if Atchley failed to follow the FMP procedures, he did so as to all of the employees who were evaluated, not just Primm. Therefore, any failure to follow the FMP procedures would not have prejudiced Primm more than anyone else.

We agree with the district court that EEOC did not meet its burden of establishing any material factual dispute with respect to the issue of pretext.

IV

For the reasons discussed above, we AFFIRM.